UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SALEEM BUTT,

                              Plaintiff,

                                                        **MEMORANDUM AND ORDER**

        —against—
                                                        10-CV-1890 (SLT)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant,
----------------------------------------------------------x
**TOWNES, United States District Judge:**

        Plaintiff Saleem Butt brings this *pro se* action against the Commissioner of Social

Security ("Commissioner"), seeking review of an administrative law judge's decision finding

him ineligible for disability insurance benefits ("DIB") under Title II of the Social Security Act

("SSA"), 42 U.S.C. §§ 401–434, and Supplemental Security Income ("SSI") payments under

Title XVI of the SSA, 42 U.S.C. §§ 1381–1383f.  The Commissioner now moves for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons

stated below, that motion is granted and this action is dismissed.

### BACKGROUND

        On December 8, 2006, plaintiff made an oral claim for DIB and SSI (83).[1]  According to

information recorded by the SSA, plaintiff stated that since October 1988 he had been employed

full-time as a laborer at a "copier company," earning $16.00 per hour for assisting in the printing

and manufacturing of "copy orders" (89).  The job entailed lifting and carrying boxes of paper

and other materials, frequently weighing around 10 pounds but sometimes weighing as much as

20 pounds, for distances of 25 to 30 feet (89).  The job also required that plaintiff walk and/or

stand for six hours per eight-hour workday (89).

_____

        [1]Numbers in parentheses denote pages in the administrative record.

Plaintiff claimed that he suffered from heart conditions, colon problems and pain in his feet and ankles, but that these had not interfered with his ability to work until November 2006 (88). For a month, plaintiff attempted to continue working by performing "much lighter duties" (88). However, by December 1, 2006, his condition had become so bad that he stopped working altogether (88). Plaintiff claimed he was unable to perform any type of activity because of severe heart problems, frequent fatigue, and pain throughout his feet and ankles (88).

When asked to detail his medical history, plaintiff listed three doctors, hospitals or clinics. First, he stated that he had seen a "Dr. Asim Hamed" at City Medical Association in Flushing, New York, in November 2006, and that this doctor had performed a blood test and prescribed Lipitor and Naproxen (91-92). Second, plaintiff stated that in November and December 2006, Advanced Radiological Imaging Associates in Elmhurst, New York, had taken various studies of his back, including an X-ray, a CT scan and an MRI (90, 93). Third, plaintiff stated that he had been to Woodhull Medical Center in Brooklyn on December 15 and 22, 2006, where he had received both a blood test and another X-ray of his back (91, 93).

On January 5, 2007, a Disability Analyst at the New York State Office of Temporary and Disability Assistance wrote plaintiff a letter, requesting that he complete a Work History Report, a Disability Report and other paperwork (95). These documents were completed by plaintiff's daughter on January 17, 2007 (106, 114). Although plaintiff had previously told an SSA interviewer that he could speak, read, and understand English, and could write more than his name in English (87), plaintiff divulged in these documents that he had only "limited English" (102).

The information contained in the documents prepared by plaintiff's daughter differed from information which had been recorded by the SSA interviewer a few weeks earlier. First,

2

plaintiff stated that he was a messenger, not a laborer, at C2 Media, Inc.; had started work there in January 1989, not October 1988; and was paid $8.62 per hour, not $16 per hour (107-08, 119). Although plaintiff's duties as a messenger – namely, carrying parcels and folders to and from clients – were different from the duties plaintiff claimed to have performed as a laborer, plaintiff still maintained that the parcels weighed up to 20 pounds and frequently weighed 10 pounds (108). However, plaintiff increased his estimate of the amount of time spent walking and standing, alleging that he spent 6-8 hours per day engaged in these activities (108). In addition, plaintiff, who previously told the SSA that his job did not involve kneeling or stooping (89), now estimated that he had to kneel for 6-8 hours per day and stoop for 2-3 hours (108).

The documents plaintiff sent to the State Disability Analyst also provided an expanded history of plaintiff's ailments. Although plaintiff told the SSA interviewer that his work activities had not been affected until November 2006, the documents he sent to the State Disability Examiner indicated that plaintiff had felt "minor pains" in his foot 8 years earlier (103). These pains affected plaintiff's activities enough to cause plaintiff to seek medical treatment (103-04). The doctor told him to "go for therapy to prevent a greater problem," but plaintiff did not follow this advice because therapy conflicted with his work schedule (103). Eventually, the pain became so great that plaintiff concluded it was "better for [him] to go for therapy" (103). On a form entitled "Medical and Job Worksheet," plaintiff stated: "I will continue my treatment now, but the pain is so severe, I have difficulty walking/standing" (118).

Plaintiff's pain was not so great, however, as to prevent plaintiff from walking and standing altogether. In a document describing plaintiff's functional limitations, plaintiff's daughter wrote that plaintiff could not walk or stand as much as he used to (97), but would nonetheless go outside for walks once or twice a day (99) and would go shopping with his wife

3

one to three times a week (100-01). While the pain involved in walking caused him to walk slowly with a slight limp, plaintiff could nonetheless walk for 20 to 25 minutes before having to rest for 4 to 6 minutes (102). If he walked too much, however, it would cause him "stress at night time" (101). Plaintiff's implied that this happened frequently, stating, "I wake up a lot during nights because of the pain" (97).

Despite the pain, plaintiff apparently did not seek treatment from anyone other than his primary care physician prior to December 8, 2006 – the date on which plaintiff made his oral claim for DIB and SSI (83). On his "Medical and Job Worksheet," plaintiff listed four doctors: his primary care physician, Louis Reznick, D.O.; a podiatrist, Michel Bella Corte [*sic*]; a cardiologist, Asim Hameedi; and a gastroenterologist, Vijay Arya (118). Plaintiff claimed that he had first seen Dr. Reznick 8 to 10 years earlier, and had last seen him on December 1, 2006 – the day on which plaintiff quit working (118). However, plaintiff indicated that he had seen each of the other doctors only once, stating that he saw Dr. Bella Corte on December 8, 2006; saw Dr. Hameedi on December 12, 2006; and saw Dr. Arya on December 13, 2006 (118). In addition, plaintiff alleged that another podiatrist, Louis Belcastro, had sent him for a "Foot MRI" (119), and that this test had been performed at Advanced Radiology on December 15, 2006.

Upon receipt of these documents, the State Disability Analyst attempted to obtain documents from all four doctors, from Woodhull Medical Center and from Advanced Radiological Imaging. The Disability Analyst encountered varying degrees of success, but ultimately obtained some, if not all, of the medical records in the possession of the doctors and Woodhull. However, these records, which are described in more detail below, did not substantiate plaintiff's claims of disability.

4

*Dr. Reznick's Records*

The Administrative Record documents the Disability Analyst's persistent efforts to obtain a medical questionnaire and other medical records from Dr. Reznick, a Doctor of Osteopathy who served as plaintiff's primary care physician. The Disability Analyst first mailed Dr. Reznick a request for these documents on January 23, 2007 (224-25). On February 21, 2007, having received no response to the original request, the Disability Analyst mailed both a follow-up letter to Dr. Reznick (225) and a letter to plaintiff, requesting that he contact the doctor's office and urge the doctor to respond (224). The Disability Analyst sent yet another request on March 7, 2007 (198).

Dr. Reznick ultimately responded to these requests on March 12, 2007, by completing the medical questionnaire and attaching copies of lab reports and medical reports issued by other doctors. The questionnaire indicated that Dr. Reznick had last seen plaintiff on February 9, 2007, at which time plaintiff was complaining of chest and leg pain, a cough and shortness of breath (199). Plaintiff had previously been diagnosed with "hypercholesterol," asthma, GERD and heel spurs (199),[2] and Dr. Reznick had referred plaintiff to various other doctors, including a gastroenterologist, a cardiologist, a podiatrist and a vascular specialist. Accordingly, Dr. Reznick referred the questions regarding plaintiff's chest pains and electrocardiograms ("ECGs") to the cardiologist. Dr. Reznick left blank those sections of the questionnaire which requested that he "[d]escribe any limitations of physical activity as demonstrated by fatigue, palpitation, dyspnea

---

[2]"GERD" is an acronym for Gastroesophageal reflux disease, a chronic digestive disease that occurs when stomach acid or, occasionally, bile flows back (refluxes) into the food pipe (esophagus), causing irritation to the lining of the esophagus. *See* http://www.mayoclinic.com/health/gerd/DS00967.

or anginal discomfort" (205) and give an opinion regarding plaintiff's ability to do such work-related activities as lifting and carrying objects, standing and walking, and pushing and pulling hand and foot controls (205-06). Rather, Dr. Reznick checked a box to indicate that he could not "provide a medical opinion regarding [plaintiff's] ability to do work-related activities" (206).

In the medical questionnaire, Dr. Reznick stated that he had first seen plaintiff in 1992. Moreover, Dr. Reznick's questionnaire provided evidence that the doctor had seen plaintiff on a regular basis prior to February 7, 2007, listing blood pressure readings from a visit in December 2004, two visits in 2005, and four visits in 2006 (204). However, the documents supplied by Dr. Reznick did not include the doctor's chart or any notes relating to these prior visits.

Documents attached to Dr. Reznick's records contained some indication of the health issues which had been addressed by the doctors in 2006. For example, these documents indicated that Dr. Reznick had referred plaintiff to Doshi Diagnostics for a chest X-ray on April 4, 2006, because plaintiff had shortness of breath and bronchitis (187). That X-ray showed that plaintiff's lungs were clear, that plaintiff's heart was "top normal in size," and that there was no active disease (191). However, Dr. Reznick continued to check plaintiff's breathing thereafter, conducting spirometry tests on August 12 and December 6, 2006 (192, 194).[3] The former showed that plaintiff's breathing was severely restricted (192), while the latter showed only moderate restrictions (194). In addition, plaintiff had blood tests on April 4 and December 7, 2006, which showed that plaintiff continued to have high cholesterol (189, 196).

------

[3]A spirometry test – which measures how much air a patient can inhale and exhale and how fast the patient can exhale – is a common office test used to diagnose asthma, chronic obstructive pulmonary disease (COPD) and certain other conditions that affect breathing or to check the lung function of a patient diagnosed with one of these chronic lung conditions. *See* http://www.mayoclinic.com/health/spirometry/MY00413.

### *Dr. DellaCorte's Records*

The Disability Analyst succeeded in obtaining a medical questionnaire – but little else – from plaintiff's podiatrist, Dr. Michael DellaCorte (233-39). In a questionnaire dated March 12, 2007, Dr. DellaCorte reported that he had seen plaintiff "twice in three months," having seen plaintiff for the first time on December 8, 2006, and most recently on March 12, 2007 (233). The questionnaire noted that plaintiff had a heel spur in the left foot and was still experiencing "pain upon waking in [the] morning and walking" as of March 12, 2007 (233). However, the questionnaire further noted that an MRI had uncovered no foot abnormalities, and that plaintiff had showed improvement after a "local injection" (234). Although plaintiff still exhibited a "mild antalgic gait," Dr. DellaCorte opined that plaintiff had an "excellent prognosis" and no limitations in his ability to stand or walk or lift and carry objects (235-36).

### *Woodhull's Records*

Although Dr. DellaCorte first saw plaintiff in early December 2006, records that the Disability Analyst received from Woodhull indicated that plaintiff had a long history of foot problems. These records indicated that plaintiff had been diagnosed with generalized osteoarthritis as early as April 27, 2001 (129). On that same date, an X-ray of plaintiff's left ankle revealed a "[p]rominent posterial calcaneal spur" and a "small plantar calcaneal spur" (131).

Aside from these records and the results of a blood test conducted on May 2, 2001 (130), Woodhull had no other medical records for plaintiff. Plaintiff had told the SSA Interviewer that he had been to Woodhull Medical Center on December 15 and 22, 2006, so the Disability Analyst sent Woodhull a second request for documents (132). Woodhull responded by re-

7

sending the 2001 records discussed above and by noting on the request form that they had no other information regarding plaintiff (132-135).

**Dr. Hameedi's Record**

The Disability Analyst obtained a detailed report concerning plaintiff's December 12, 2006, visit to Dr. Amir Hameedi, a cardiologist affiliated with City Medical Associates, P.C. (124-126).  This report indicates that Dr. Reznick referred plaintiff to Dr. Hameedi because of an "abnormal ECG" (124).  However, at the December 12 examination, plaintiff denied having any chest pains and said that he experienced shortness of breath only "on exertion when climbing stairs" (124).

Dr. Hameedi conducted a complete cardiovascular examination, including a nuclear exercise stress test which involved walking on a treadmill (125).[4]  Although the test was terminated after about 10 minutes, 18 seconds, Dr. Hameedi's report indicate that plaintiff was unable to complete the test "due to fatigue," and makes no mention of any complaints of pain (125).  Dr. Hameedi uncovered no evidence of obstructive coronary artery disease or structural heart disease (126).  He discussed "healthy lifestyle strategies" with plaintiff, including the need for regular aerobic exercise, then directed him to "[f]ollow up with cardiology in six months" (126).

---

[4]Dr. Hameedi's notes indicate that he used a modified Bruce protocol (125).  Both the modified and standard Bruce protocols involve treadmill exercise.  The standard Bruce protocol involves 7 three-minute stages, starting at a speed of 1.7 miles per hour and a gradient of 10% and increasing by 0.7 to 0.8 mph in speed and 2% in gradient at each subsequent stage.  In the modified Bruce protocol, the speed remains at 1.7 mph for the first three stages, with the gradient increasing from 0% in the first stage to 10% in the third.  In the fourth stage – during which plaintiff's test was terminated – the speed increases to 2.5 to 2.6 mph and a 12% gradient.  *See* http://www.cardiophile.com/modified-bruce-protocol.

8

*Dr. Arya's Records*

The Disability Analyst succeeded in obtaining both a medical questionnaire and medical records from Dr. Vijaypal Arya, plaintiff's gastroenterologist. When Dr. Arya completed the questionnaire on February 23, 2007, Dr. Arya had seen plaintiff only twice: on December 13, 2006, and on January 22, 2007 (144). Dr. Arya's detailed report of the first visit indicates that plaintiff was referred because he was complaining of "abdominal discomfort" (149). At the initial examination, plaintiff told Dr. Arya that he had been suffering from indigestion, gaseousness and bloating for a few months, but estimated the severity of his condition as only a 2 on a scale of 1 to 10 (149). According to Dr. Arya's report, plaintiff claimed to have arthritis, but denied having chest pains or shortness of breath (149).

Based on his initial examination, Dr. Arya suspected plaintiff might have Peptic Ulcer Disease ("PUD") and/or colon polyps and recommended both an esophagogastroduodenoscopy ("EGD") and a colonoscopy.[5] The EGD was conducted on January 22, 2007, at Wyckoff Heights Medical Center. That procedure determined that plaintiff had mild esophageal inflammation, a hiatal hernia, and an inflammation of the lining of the stomach (152).[6] Dr. Arya diagnosed plaintiff with gastritis and GERD, and theorized that he might have celiac sprue disease – a digestive condition in which consumption of the protein gluten triggers an immune

---

[5]An EGD is an examination of the lining of the esophagus, stomach, and upper duodenum with a small camera (flexible endoscope) which is inserted down the throat. *See* http://www. nlm.nih.gov/medlineplus/ency/article/003888.htm. A colonoscopy is an endoscopic examination of the large intestine. *See* http://www.nlm.nih.gov/medlineplus/colonoscopy.html.

[6]A hiatal hernia occurs when part of the stomach pushes upward through the small opening (hiatus) in the diaphragm through which the esophagus passes. *See* http://www. mayoclinic.com/health/hiatal-hernia/DS00099.

reaction in the small intestines, causing damage to the inner surface of the small intestine and an inability to absorb certain nutrients. *See* http://www.mayoclinic.com/health/celiac-disease/ DS00319.

During the EGD, Dr. Arya performed biopsies of both the pyloric antrum – a portion of the bottom of the stomach – and the top of the small intestine (156). Laboratory examination of the first of these specimens revealed the presence of Helicobacter Pylori (156) – a bacterium which is common cause of peptic ulcers. *See* http://www.mayoclinic.com/health/h-pylori/ DS00958. Laboratory examination of the second specimen found no evidence of this bacterium, but resulted in findings consistent with chronic peptic duodenitis (156).

Helicobacter Pylori can be treated with antibiotics. *See* http://www.mayoclinic.com/ health/h-pylori/ DS00958. Plaintiff made an appointment to see Dr. Arya for a third time to obtain these medications. However, according to the medical questionnaire, plaintiff cancelled at least one such appointment (144). At the time Dr. Arya completed the questionnaire, plaintiff had re-scheduled his appointment for February 27, 2007 (144). Although Dr. Arya wrote a prescription for Helidac therapy on that date (227), indicating that plaintiff kept the scheduled appointment, the Disability Examiner did not obtain any records relating to this visit.[7]

The Administrative Record contains one additional report from Dr. Arya, dated May 24, 2007 (249). This report indicates that plaintiff completed the Helidac therapy and felt better, denying that he had any abdominal pain (249). Plaintiff also denied having any chest pain or shortness of breath (249). Dr. Arya scheduled the colonscopy for June 25, 2007, to check for the colon polyps (249).

---

[7]Helidac therapy, which involves taking three separate prescription drugs, is used to treat Helicobacter Plylori. *See* http://www.rxlist.com/helidac-drug.htm.

10

Dr. Arya's May 24, 2007, report was completed the day before the Disability Analyst rendered his decision. It is unclear whether or when the Disability Examiner obtained this report before issuing his decision. In addition, although there are documents suggesting that Dr. Arya arranged to perform the colonscopy on June 25, 2007, at Wyckoff Heights Medical Center (160), the Administrative Record does not indicate whether this procedure was ever performed.

### *Dr. Gowd's Opinion*

On or before May 10, 2007, the Disability Examiner sent an "Electronic Request for Medical Advice" to Dr. Gowd, an internist and/or cardiologist (241). That request characterized plaintiff as a 56-year-old messenger with foot pain and asthma, and asked Dr. Gowd to assess both the severity of plaintiff's conditions and plaintiff's residual functional capacity ("RFC") based on the medical records provided (241).

Because of the cryptic nature of Dr. Gowd's response, it is unclear if the Disability Analyst provided all of the records discussed above. However, Dr. Gowd's response suggested that he had read, at a minimum, Dr. Hameedi's report; the results of the August 12, 2006, spirometry test; and a "medical note" from March 12, 2007 – which could be the medical questionnaire completed by Dr. DellaCorte or Dr. Reznick (241). Based solely on his review of these records, Dr. Gowd opined that plaintiff was "known to have" high cholesterol, asthma and GERD, but had no significant cario-pulmonary impairment (241). Dr. Gowd further opined that plaintiff could stand and walk 6 hours, lift 50 pounds occasionally, stoop and crouch frequently and kneel and crawl without limitation (241).

### *The Disability Analyst's Determination*

The Disability Analyst relied heavily on Dr. Gowd's assessment in preparing his own assessment of plaintiff's RFC on May 23, 2007. After noting that plaintiff's own doctor had not

11

offered an opinion regarding his RFC, the Analyst found that the objective medical examination "support[ed] an RFC for medium work" (247). Specifically, the Analyst found that while plaintiff had been diagnosed with asthma, GERD and high cholesterol, his "cardiac and pulmonary testing indicate[d] an RFC for medium work" and that plaintiff's conditions did not prevent plaintiff from standing, walking or sitting for about six hours during an eight-hour workday, lifting 50 pounds occasionally, or lifting 25 pounds frequently (244). The Analyst asserted that plaintiff had received treatment for his asthma, foot and digestive problems, and specifically cited to that portion of Dr. DellaCorte's questionnaire which stated that the bone spurs in plaintiff's feet had improved with treatment (244, 246).

On May 25, 2007, the SSA mailed plaintiff a notice that his claims had been disapproved (29-32). Attached to the notice were two identical one-page "Explanation of Determination" forms (one relating to the DIB claim and the other to the SSI claim), which informed plaintiff that a State agency had determined that his conditions were not severe enough to keep him from working (33, 35). The form stated, in pertinent part:

> The medical evidence shows that you have had pain, but you are able to move about freely. Since you were treated, your condition has stabilized. Based on the way your job as a MESSENGER is usually performed, your condition does not prevent you from performing this work (33) (emphasis in original).

The form also purported to list the documents considered by the State agency, listing "Woodhull Medical Center, report of 01/11/07, Della Carte [sic] Foot Care, report of 05/03/07 and Vijaybal [sic] Arya MD, report of 03/02/07" – none of which are contained in the Administrative Record. Although the Disability Analyst's RFC assessment had made specific reference to Dr. Gowd's medical advice and had alluded to Dr. Reznick's medical questionnaire, the form stated, "We did not obtain any other reports because no others were available" (33).

12

### *Proceedings before the Administrative Law Judge*

On June 5, 2007, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (39). That hearing ultimately took place on August 25, 2008, before ALJ Seymour Fier (4-17). Although the ALJ arranged to have a vocational expert, Donald R. Slive, and a medical expert, Bernard D. Gussoff, attend the hearing (54-57), plaintiff was the only witness who testified at the hearing.

Plaintiff's testimony began normally, with plaintiff confirming that he was born on December 12, 1950, in Pakistan (7). Immediately thereafter, however, plaintiff contradicted this testimony, stating that he was actually born in Pakistan on some unknown date in 1948 (7). By way of explanation, plaintiff stated, "When I was immigrant, I put December 1950 and then they keep going on that December 1950" (7).

Plaintiff testified that he had attended high school and one year of college in Pakistan, before immigrating to the United States (7-8). Plaintiff became a citizen of this country in 1991, and worked as a messenger for about 20 years before stopping on December 1, 2006 (8). However, when asked how long he had been out of work, plaintiff testified that he had returned to work on December 30, 2007 (8-9). Plaintiff explained that his wife did not work and that he had to resume working to support the family (8-9).

After establishing that plaintiff was not seeking to recover benefits for the 13 months in which he was not working, but for the entire period from December 1, 2006, the ALJ advised plaintiff that he could not receive such benefits because he was working (10-12). The ALJ indicated that plaintiff might be able to recover benefits for the 13 months in which he was not working (14, 16). However, upon further inquiry, the ALJ established that plaintiff had received unemployment benefits for 26 weeks during the 13-month period (15). The ALJ implicitly

13

took judicial notice of the fact that plaintiff would have had to attest to his ability to work in order to receive the unemployment benefits, and informed plaintiff that he would not be eligible for benefits even for the 13-month period (16). ALJ Fier then ended the hearing without taking any further testimony, telling plaintiff that he would receive a copy of the ALJ's decision in the mail (16).

### *The ALJ's Decision*

On September 29, 2008, ALJ Fier issued his decision, denying plaintiff's claims for DIB and SSI on the ground that plaintiff had not been disabled, as that term is defined in the SSA (23-28; 251-59). The ALJ discussed at length the "five-step sequential evaluation process for determining whether an individual is disabled," applicable to both DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). For example, in discussing the first step of the process, the ALJ not only noted that he had to "determine whether the claimant is engaging in substantial gainful activity," but proceeded to define the terms, "substantial gainful activity," "substantial work activity," and "gainful work activity" (255). Similarly, in describing step two of the analysis, the ALJ first noted that he had to "determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments which is 'severe," then explained the distinction between "severe" and "not severe" (255).

The ALJ applied this five-step framework and determined that the claimant had engaged in substantial gainful activity since December 1, 2006 (256). The ALJ noted that plaintiff had testified that he returned to work on December 30, 2007, and had been working since that date (256). The ALJ cited the regulations which defined "substantial gainful activity" (255), but did not discuss what type of work plaintiff was performing or whether the work met that definition.

14

Although the ALJ noted that the five steps were to be followed in order, and that it was unnecessary to proceed to the next step once a claimant had been found not to be disabled (255), the ALJ nonetheless proceeded to step two. The ALJ determined that plaintiff had three medically determinable impairments: osteoarthritis, foot pain, and asthma (256). However, the ALJ concluded that none of these impairments, either individually or in combination with the others, was "severe" because no impairment or combination of impairments significantly limited, or was expected to significant limit, plaintiff's ability to perform basic work-related activities for 12 consecutive months (256). In reaching this conclusion, the ALJ principally relied on plaintiff's admission that he had received unemployment insurance benefits for the six-month period between December 1, 2006, and June 1, 2007 (257). ALJ Fier reasoned:

> In order to receive unemployment benefits the claimant had to acknowledge that he was ready, willing and able to work. Therefore the claimant cannot be considered disabled for the six month period of December 1, 2006 to June 1, 2007. Since he started working again on December 30, 2007 his medically determinable physical impairments did not last for a continuous period of at least 12 months (257-58).

The ALJ also noted that the medical records did not indicate that plaintiff's impairments were so severe as to prevent plaintiff from working (258).

Plaintiff requested that the Appeals Council review the ALJ's decision. However, on March 18, 2010, the Appeals Council denied this request, making the ALJ's September 8, 2008, decision the final decision of the Commissioner in plaintiff's case (1-3).

### *The Instant Action*

On April 27, 2010, plaintiff, still proceeding *pro se*, commenced this action, seeking review of this decision pursuant to § 205(g) and/or § 1383(c)(3) of the SSA (*i.e.*, 42 U.S.C.

15

§ 405(g) and/or 42 U.S.C. § 1383(c)(3)). In a complaint, plaintiff alleged that he had been disabled by "extreme/striking leg pains and foot pain" since December 1, 2006 (Complaint at ¶¶ 4-5). The complaint alleged that the decision of the ALJ was "erroneous, not supported by substantial evidence on the record and/or contrary to the law" (*Id.* at ¶ 9). However, because the *pro se* plaintiff used a form complaint, the complaint did not address the specifics of the ALJ's decision.

On May 4, 2010, this Court issued two orders. The first order, among other things, directed defendant to move for judgment on the pleadings. The second order directed the Clerk of Court to attempt to obtain *pro bono* counsel for plaintiff.

Defendant complied with the first order in mid-September 2010 by filing his motion for judgment on the pleadings. Pursuant to the second order, the Clerk of Court contacted a *pro bono* attorney, who then attempted to contact plaintiff with regard to this case (*See* Letter to Cathy Wolfe from Christopher J. Bowes, dated Aug. 16, 2011). However, according to the attorney, plaintiff did not return his calls (*id.*). Accordingly, the second order is vacated, and this Court will proceed to adjudicate defendant's motion.

## DISCUSSION

### Scope of Review

"The scope of review of a disability determination under 42 U.S.C. § 423(a)(1) . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 983 (2d Cir. 1987) (citing cases). First, a court must decide whether the Commissioner "applied the correct legal principles in making the determination." *Id.* Second, a court must decide "whether the determination is supported by 'substantial evidence.'" *Id.* (citing 42 U.S.C. § 405(g) (1982)). "Substantial evidence" has long been defined as meaning "such relevant evidence as a reasonable mind might

16

accept as adequate to support a conclusion," not a "mere scintilla." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

### *The Correct Legal Principles*

With respect to the first inquiry, this Court must be satisfied that the ALJ's decision was

"guided by the relevant legal standards." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). In

order to be "disabled" within the meaning of the SSA, a plaintiff must establish "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the impairment must be of "such

severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Regulations promulgated by the Social Security Administration dictate a five-step

analysis which must be used to determine if a claimant is disabled. *See* 20 C.F.R. §§ 404.1520,

416.920. This five-step process has been summarized by the Second Circuit as follows:

> 1. The Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a
> "severe impairment" which limits his or her mental or physical
> ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner
> must ask whether, based solely on medical evidence, claimant has
> an impairment listed in Appendix 1 of the regulations. If the
> claimant has one of these enumerated impairments, the
> Commissioner will automatically consider him disabled, without
> considering vocational factors such as age, education, and work
> experience.

17

> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw*, 221 F.3d at 131 (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir.1998)). The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. *Id.*; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

In the first of these five steps, the Commissioner must evaluate whether a claimant is engaged in "substantial gainful activity." The Social Security regulations define this term to mean work that "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. Work that meets the first criterion is deemed "substantial work activity," while work that meet the later criterion is called "gainful work activity." 20 C.F.R. §§ 404.1572, 416.972. Work activity may be "substantial" even if it is part-time or involves less activity, compensation or responsibility than work done prior to the onset of the disability. *Id.*, §§ 404.1572(a), 416.972(a). "Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.*, §§ 404.1572(b), 416.972(b).

In the second of the five steps, the Commissioner must determine whether a claimant has an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" are the "the abilities and aptitudes necessary to do most jobs," and include:

18

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b). In addition, in order to satisfy step two, the impairment or combination of impairments must meet the "duration requirement" set forth in 20 C.F.R. §§ 404.1509 and 416.909. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). This section provides that unless the impairment or combination of impairments is "expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509, 416.909.

In this case, the ALJ's decision amply demonstrates that he applied the correct legal principles. The decision noted that "the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled," and cited to the regulations setting forth that process (255). The ALJ then thoroughly discussed the regulations relevant to each step of the process, before determining that plaintiff had engaged in substantial gainful activity and did not have severe impairment.

***Substantial Evidence***

Since this Court is satisfied that the ALJ used the correct legal standard, this Court turns to the second inquiry: whether the ALJ's determinations were supported by substantial evidence.

19

This Court has thoroughly reviewed the Administrative Record, and finds ample evidence to substantiate each of the ALJ's conclusions.

First, plaintiff candidly admitted at the August 25, 2008, hearing that he had resumed working on December 30, 2007 (8-9). Plaintiff testified that he had been working five days a week as a messenger (12), and alluded to the self-evident fact that the job entailed a lot of walking (10). Plaintiff implied that his impairments made it difficult to perform his work, but indicated that he had to return to work because he needed the money and his wife did not work (8-10). Since this testimony amply established that plaintiff was both performing "significant and productive physical . . . duties," and doing so for pay, plaintiff's testimony constituted substantial evidence plaintiff was engaged in "substantial gainful activity." *See* 20 C.F.R. § 404.1510; *see Figueroa-Plumey v. Astrue*, 764 F. Supp. 2d 646, 652 (S.D.N.Y. 2011) (holding that a single mother's concession that she "'had to perform work' to support her son" established that plaintiff was able to work and undermined her claim of disability under the SSA).

There was also substantial evidence in the Administrative record to substantiate the ALJ's determination with respect to step two. First, the ALJ's conclusion that plaintiff's impairment or combination of impairments did not meet the one-year "duration requirement" was substantiated by plaintiff's admission that he received unemployment insurance benefits for the period between December 1, 2006, and June 1, 2007 (15). In order to file a valid claim for unemployment insurance benefits under New York law, a claimant must be able and available to work. *See* N.Y. Labor Law § 527(1)(a). Accordingly, "[c]ourts in this circuit have considered a plaintiff's receipt of unemployment benefits for the premise that 'the record establishes that Plaintiff was able to work . . . as evidenced by Plaintiff's receipt of unemployment benefits, which requires an ability to work.'" *Jackson v. Astrue*, No. 1:05-CV-01061 (NPM), 2009 WL 3764221, at *8 (N.D.N.Y.

Nov. 10, 2009) (quoting *Rich v. Comm. of Social Sec.*, No. 08-CV-510S, 2009 WL 2923254 at *1 (W.D.N.Y. Sept. 10, 2009) (ellipses added).

Second, the Administrative Record supports the ALJ's determination that plaintiff did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities. Although plaintiff originally claimed that he was disabled due to "severe heart problems," colon problems and pain throughout his feet and ankles (88), he made these claims before receiving diagnoses from a cardiologist or gastroenterologist. Indeed, when plaintiff first filed his claim on December 8, 2006, he had yet even to visit the cardiologist and gastroenterologist listed in his "Medical and Job Worksheet" (118). Moreover, while plaintiff may have been diagnosed with bone spurs in his left foot prior to filing his disability claim, those bone spurs were first detected as early as April 2001 (135). Indeed, plaintiff felt "minor pains" in his foot 8 years prior to filing his claim, but ignored his doctor's advice that he "go for therapy to prevent a greater problem" because the therapy conflicted with his work schedule (103).

When plaintiff consulted with the specialists in the week after he made his initial, oral claim, he discovered that his problems were either readily treatable or non-existent. Dr. DellaCorte, a podiatrist whom plaintiff first consulted on December 8, 2006, verified that plaintiff had a bone spur in his left heel (233), but noted that an MRI of the foot had uncovered no further abnormalities (234). Dr. DellaCorte administered a "local injection" and plaintiff's condition improved (234). Plaintiff still exhibited a "mild antalgic gait" at the time of his March 12, 2007, visit to Dr. DellaCorte (236), but the doctor opined that plaintiff had an "excellent prognosis" (234).

Dr. Hameedi, a cardiologist, conducted a complete cardiovascular examination of plaintiff on December 12, 2006. According to Dr. Hameedi, plaintiff denied having any chest

21

pains and was able to walk on a treadmill for over 10 minutes, becoming fatigued only after the speed increased to roughly 2.5 miles per hour and the gradient increased to over 10% (125). The tests conducted by Dr. Hameedi found no evidence of obstructive coronary artery disease or structural heart disease (126).

Dr. Arya, a gastroenterologist, first saw plaintiff on December 13, 2006, at which point plaintiff was complaining of mild "abdominal discomfort" – 2 on a scale of 10 (149). Dr. Arya performed an EGD on January 22, 2007, which determined that plaintiff had mild esophageal inflammation, a hiatal hernia, and an inflammation of the lining of the stomach (152). The stomach inflammation was later attributed to the presence of Helicobacter Pylori (156), and was treated with Helidac therapy (227). On May 24, 2007, after completing the treatment, plaintiff reported that he felt better and denied having any abdominal pain (249). Plaintiff also denied having any chest pain or shortness of breath (249).

None of plaintiff's treating physicians opined that plaintiff had any limitations. In his medical questionnaire, Dr. DellaCorte affirmatively stated that plaintiff had *no* limitations in his ability to stand or walk or lift and carry objects (235-36). Dr. Hameedi did not complete a medical questionnaire, but provided a detailed report indicating that plaintiff had no cardiac problems. Dr. Arya checked a box on the medical questionnaire indicating that he could not provide a medical opinion regarding plaintiff's ability to do work-related activities (147).

Dr. Reznick, who had served as plaintiff's primary care physician since 1992 (199), also declined to provide a medical opinion regarding plaintiff's ability to do work-related activities (206). Dr. Reznick noted that plaintiff had been diagnosed with asthma, but provided reports of an April 2006 chest X-ray which showed no active disease (191) and a spirometry test dated

22

December 6, 2006, which indicated that plaintiff had only a moderate restriction in his breathing (194).

The only doctor who opined that plaintiff had any limitations was Dr. Gowd, the independent medical expert contacted by the State Disability Examiner. Dr. Gowd opined that plaintiff could stand and walk 6 hours per eight-hour day and lift 50 pounds only occasionally (241). While this Court has serious doubts as to whether Dr. Gowd, who never examined plaintiff, had an adequate evidentiary basis for these opinions, this Court notes that even these limitations would not have interfered with plaintiff's ability to do medium work. *See* 20 C.F.R. § 404.1567(c).

## CONCLUSION

For the reasons set forth above, this Court finds that the ALJ applied the correct legal principles in making his determination, and that his determination was supported by substantial evidence. Accordingly, defendant's motion for judgment on the pleadings is granted and this action is dismissed. The Clerk of Court is directed to enter judgment in favor of defendant and to close this case.

**SO ORDERED.**

s/ SLT

SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2011
Brooklyn, New York

23